IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 19, 2023 Session

**IN RE EDWARD C.**

**Appeal from the Juvenile Court for Sevier County**
**No. 21-000811        Jeffrey D. Rader, Judge**

_____

**No. E2023-00210-COA-R3-PT**
_____

This is an appeal of the termination of a father's and mother's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Sevier County ("the Juvenile Court") seeking the termination of the parental rights of Justin S. ("Father") and Alyse C. ("Mother") to their minor son Edward C. ("the Child"). The Juvenile Court found that DCS had established by clear and convincing evidence the following statutory grounds for each parent: (1) abandonment by failure to provide a suitable home, (2) persistence of conditions, and (3) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. The Juvenile Court further found that termination of Father's and Mother's parental rights was in the Child's best interest. Although we vacate the statutory ground of abandonment by failure to provide a suitable home due to insufficient findings of fact as it relates to Mother, we affirm the Juvenile Court's judgment in all other respects, including termination of Mother's and Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part, Vacated in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

James R. Hickman, Jr., and Vicki Tucci Krusel, Sevierville, Tennessee, for appellant, Alyse C.

Gregory E. Bennett, Seymour, Tennessee, for appellant, Justin S.

Jonathan Skrmetti, Attorney General and Reporter, and Amber L. Barker, Assistant Attorney General for the appellee, Tennessee Department of Children's Services.

# OPINION

## Background

On July 24, 2020, DCS filed in the Juvenile Court a petition seeking temporary legal custody of the Child born in October 2019. DCS averred that it had received allegations of environmental neglect and exposure to drugs by Mother and her paramour. DCS became involved after Mother, her paramour, and the Child were brought to the Sevier County Police Department after police had conducted a welfare check on the family. The couple and the Child had been staying in the lobby of a Days Inn; they had no place to stay and no money for a room. DCS drug screened Mother and her paramour. Mother tested positive for cocaine. She admitted to marijuana use but denied that she had used cocaine. Mother reported to DCS that she was married to Father but claimed that he was not the biological father of the Child.

According to the petition, Father agreed to take the Child but his then-paramour, Cynthia S. ("Cynthia"),[1] was a "substantiated perpetrator in the DCS system for Drug Exposed Child," and Father was unwilling to make her move out of his home. Father married Cynthia in June 2022. DCS averred that Father had seen the Child only once since the Child was born. DCS was unable to locate any appropriate relatives to assume custody of the Child. The Juvenile Court entered a protective custody order, finding probable cause that the Child was dependent and neglected *due to the substance abuse issues of the mother, lack of housing, and because the legal father's fiancé has been substantiated in the past for Drug Exposed Child.*

In October 2020, DCS filed an amended petition for temporary legal custody adding the following allegations related to Father:

> Since the child entered DCS custody, DCS learned that the child's father was either [Father] or another gentleman who has since been ruled out by DNA. Despite [Father] being the child's legal father and knowing he might actually be the biological father, [Father] met the child when he was approximately one month old and did not seek further visitation and never saw the child again until he was in foster care. Despite demanding custody of the child after the child was in foster care, [Father] was very resistant to actually visiting the child and getting to know the child and would not allow FSW Vineyard to schedule visitation for several weeks.

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties. Considering that Cynthia S. has two children in DCS's custody, we will refer to her by her first name throughout this Opinion. We mean no disrespect by doing so.

Once visitations began, DCS has grown concerned about [Father's] mental health issues. [Father] is a veteran and has been diagnosed with Post Traumatic Stress Disorder and Depression. Upon information and belief, he is participating in treatment and taking medication for his diagnosis. However, his behavior towards DCS employees, the mother, and around the child raises concerns about his mental health:

     a. [Father] has been texting the mother and telling her that he will get full custody and she has made it easy for him.

     b. When DCS would not simply release the child to him, [Father] sent threatening text messages to the FSW Vineyard telling her he would see her ass in court.

     c. When the child's pediatrician changed the child's formula to a lactose-free formula due to stomach issues, [Father] continued to feed the child regular formula even after DCS advised him of the pediatrician's recommendations. [Father] was angry at DCS for trying to correct him in any shape or form.

     d. During a visit on October 12, 2020, [Father] finally brought appropriate food for the child and when giving the child the food was overheard to state, "I brought this so she wouldn't bitch." When FSW Vineyard entered the visitation room and asked him to stop using foul language around the child and then went back behind the two-way glass, [Father] walked up to the glass, pointed at FSW and yelled "Mind your damn business!" When FSW Vineyard ended the visit[ ], he stated "I will deal with your ass in court!" [Father] also texted "regardless of what u say or think or even put in your little reports, I will stop at nothing even death to make sure it happens."

     e. During another visit when he was with the child, [Father] could be heard stating "Fuck her."

[Father] reported that his girlfriend [Cynthia] moved out of the home. However, his girlfriend, who has been found to severely abuse at least one of her own children and has another severe abuse hearing scheduled in November 2020, recently asked Knox County DCS to visit her home (the same home as [Father]) in efforts to gain supervised visitation with her children. DCS worker Amber Hawk visited the home on September 29, 2020 and met with both [Father] and his girlfriend, [Cynthia]. Both [Father] and

- 3 -

[Cynthia] represented that they live at the home together and made no indications to Ms. Hawk that [Cynthia] would be moving out.

(Paragraph numbering omitted.)

On November 4, 2020, the Juvenile Court entered an order finding the Child to be dependent and neglected. The Juvenile Court found:

Father stipulates to a clear and convincing finding of dependency and neglect because at the time of removal, his paramour was restricted from her own children[.]

Default finding of dependency & neglect against the mother based on the allegations in the petition.

On July 20, 2021, DCS filed a petition to terminate the parental rights of Father and Mother to the Child. DCS averred that it had given Father the option to take custody of the Child if Cynthia moved out of his home. DCS claimed that he declined this offer. DCS alleged the following four statutory grounds against both parents: (1) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child; (2) persistence of the conditions that led to the Child's removal; (3) abandonment by failure to provide a suitable home; and (4) substantial noncompliance with the permanency plan. DCS later withdrew its allegation that Mother and Father had failed to substantially comply with the permanency plan. DCS also alleged that it was in the best interest of the Child for the parental rights of both parents to be terminated. The Juvenile Court appointed a guardian *ad litem* ("GAL") for the Child and counsel for both Mother and Father.

In April 2022, DCS filed a motion to suspend Father's visitation with the Child. DCS made the following allegations:

The child attends Occupational Therapy and has been exhibiting physical stressors after visitation with his father. Those stressors are outlined in the letter attached to this Motion as Exhibit A.

Termination is pending in this matter. While the father could visit at least twice per month, he usually cancels at least one of those visits.

(Paragraph numbering omitted.) DCS attached a letter written by the Child's occupational therapist, Maggie Kesterson. Ms. Kesterson explained her concern as follows:

I have been working with [the Child] and his family for the past 6 months. While he has progressed in his fine motor skills and sensory processing skills,

- 4 -

he continues to have a retained Moro reflex. The Moro reflex is essential for infant survival outside the womb but when this reflex continues to be retained, especially after 2 years of age, it greatly hinders emotional and physical development. Symptoms of a retained Moro reflex include: poor coordination, poor learning skills, tense muscle tone, poor balance, anxiety, emotional instability and sensitivity, problems with vision, allergies, exaggerated startle response, dislike of changes or being surprised, low self-esteem, mood swings, poor auditory processing skills, low immunity, and hypersensitivity to light and sound.

Children who have a retained Moro reflex release more cortisol (the stress hormone) compared to children who have an integrated reflex. Their bodies are often in fight or flight mode and external stressors in their environment send their bodies into overdrive releasing a cocktail of stress hormones. [The Child] is currently attending visits twice a month with his biological dad for 2 hours without his foster mom present who [the Child] views as his person of comfort. Due to his retained Moro reflex, when he experiences stressful events such as this visit, his body goes into fight or flight mode. After these visits, [the Child] is experiencing 2+ days of increased meltdowns, sleep dysregulation, needing to be held constantly, and episodes of crying. He often will spend the next few days clinging to mom rather than playing and engaging in age-appropriate activities with his foster siblings. When the body experiences routine periods of high stress, it is unable to learn, grow, or develop appropriately. [The Child's] body is in survival mode, and it is impeding on his ability to reach developmental milestones, develop healthy relationships, and has affected his overall emotional stability greatly hindering his progress in OT.

At a hearing in May 2022, Ms. Kesterson testified about her history working with the Child. She stated that she started working with him in October of 2021, explaining:

[The Child] was having some meltdowns at home, he was having difficulty regulating himself, he was delayed in his fine motor skills, he was having trouble using both hands together, he was sucking his thumb really often, we observed, difficulty with balance. So kind of just a variety of reasons with that, and an occupational referral was needed.

In relation to the Child's retained Moro reflex issues and his behavior after visits with Father, she explained:

And for reasons for that reflex not to go away could be trauma-related, stressors in the environment, maternal stress, spending too much time in a highchair, a stroller, in the car seat. Just, basically, any of those stressors can

cause the body to still, at two-and-a-half years old, to be in this fight-or-flight mode. So, essentially, when [the Child] gets startled, it could be somebody's voice suddenly, being unexpectedly touched, if there's a change in the light, if there's a change in something that throws him off balance, he releases all of those chemicals, adrenaline, cortisol, and his body is not able to recover and he continues releasing those chemicals and that is resulting in what is reporting of he is having trouble settling down to go to sleep. He's not staying asleep throughout the night. He's having mood swings. He's crying, wanting to be held and not playing with his foster siblings. She's noticing that a couple of days after a visit.

She further explained that after the Child visits with Father, the Child's foster mother witnesses "a lot more dysregulation, having a really hard time, not getting a nap at all, it takes him longer to fall asleep, more mood swings, clinging to her, crying." The Juvenile Court accordingly suspended Father's visitation for sixty days.

The Juvenile Court held a trial on DCS's termination petition on October 19 and October 31, 2022. The Juvenile Court heard testimony from Mother; Father; Cynthia; Kailey Vineyard, a DCS caseworker previously assigned to the Child's case; and Lindsey F., the Child's foster mother, ("Foster Mother"). DCS presented the deposition of Jan Gardner, the current DCS caseworker assigned to the Child's case, due to her unavailability for trial, as well as a deposition of Ms. Kesterson. In addition, a transcript of the May 2022 hearing was admitted as an exhibit.

During her trial testimony, Mother explained that she was still homeless and had been living at Knoxville Area Rescue Ministry ("KARM"). She testified that she had difficulty maintaining employment anywhere for a long period of time due to her anxiety. She stated that she suffers from post-traumatic stress disorder, anxiety, and depression. Her longest stint of employment was a six-month period at a candy store called "Rocket Fizz." At the time of trial, she had been employed at a Family Dollar for a week. During the custodial period, she did not have a driver's license or a car. She testified that she had been clean from cocaine or heroin use for two years. She also testified that she visited the Child regularly. She shared that the thought of the Child being placed with Father "scared" her due to his "mental abuse" of her during their relationship. She testified that the Child had bonded to his foster parents.

On the second day of trial, Mother expressed her wish to surrender her rights to the Child. DCS indicated that it did not have someone there to complete the paperwork to process her surrender and that it intended to move forward with its case against her. Mother stated to the Juvenile Court: "I'm sorry, Your Honor. I'm going to have to leave. . . . I surrendered my rights. . . .You can take my rights because I'm sick and tired of being mentally abused . . . by his client." She then left the courtroom.

Father testified that he made Mother leave his house when she was two or three months pregnant with the Child and again when she was eight or nine months pregnant with the Child because she was in a relationship with another man at that time. He claimed that Mother told him throughout her pregnancy that he was not the biological father. He testified that he had dropped Mother off at the hospital when she was in labor and that he saw the Child briefly once after he was born. Father did not support Mother gaining custody of the Child due to her mental health and substance abuse issues.

Father acknowledged that he had an "explosive mouth" and could sometimes lose his temper. He stated that he suffers from post-traumatic stress disorder and bipolar disorder. Father also admitted that he told a therapeutic visitation supervisor that "If I could I'd pin Ms. Vineyard to a wall and tell her exactly what I thought of her." Ms. Vineyard testified that when she would advise Father on what the Child could eat, he would become "hostile" and use "foul language" toward her in front of the Child. On one occasion, Father told her to "mind [your] damn business." She testified that Father would call her a "bitch" to the Child.

In relation to Father's temper, Ms. Gardner testified that prior to the May 2022 hearing, Father approached Mother, who was sitting on a bench outside the courtroom, and stood and stared over her without saying anything. Ms. Gardner opined that she would have felt intimidated if Father had done that to her. She later found out that Father was angry at Mother because he thought she had initiated DCS's petition to suspend Father's visitation.

Father recognized that he had not visited the Child consistently and admitted responsibility for this. Despite DCS assuming custody of the Child in July 2020, Father acknowledged not visiting the Child until September 2020 because he did not want to visit the Child until DNA testing indicated whether or not he was the biological father. Father also assumed responsibility for missing four to five months of visitation during the custodial period. He also acknowledged that he did not have a strong bond with the Child and that the most time he has spent with the Child was two to four hours per month.

Despite DCS's concerns about Cynthia's presence around the Child, Father married Cynthia after DCS filed its termination petition. Father testified that DCS had asked him to remove Cynthia from his home and offered that "within three months time of her being removed that they would revisit this and maybe give [him] custody." He further stated that Cynthia moved out of his house briefly for a month early on in the custodial episode but that DCS did not make any movement toward reunifying Father and the Child. Father explained that he worked a shift at DENSO from 3:00 p.m. to 12:00 a.m. and that, if given custody of the Child, Cynthia would watch the Child while he was at work. Father testified that the Child's foster parents had been "absolutely amazing."

Father's current wife, Cynthia, testified as well. DCS presented as an exhibit a dependency and neglect order entered by the Juvenile Court for Knox County ("Knox County Court") in May 2019. The Knox County Court adjudicated Cynthia's child from a different relationship, Micayah C., dependent and neglected, as well as severely abused due to "conditions in the home that placed the child at risk of serious bodily injury or death." The Knox County Court specifically found that Micayah had been exposed to "used needles, drug paraphernalia, [and] blood products." In October 2019, the Knox County Court also entered an order finding that Cynthia's other child from another relationship, Malakai C., was dependent and neglected.[2] In February 2021, the Knox County Court entered another order finding that Malakai had been severely abused due to Cynthia's methamphetamine use while breast-feeding and the conditions of her home. Cynthia testified that she stopped using methamphetamine the day before DCS removed Malakai from her custody in the early months of 2019. Father and Cynthia currently have custody of two children from their relationship.

In her deposition, Ms. Gardner testified that she no longer had a concern "as much anymore" about Cynthia's past methamphetamine use because she had passed two random drug screens. She later agreed that these concerns were no longer immediate. She also testified that she had conducted a home visit and found the home to be suitable and clean. As far as Ms. Gardner was concerned, her only concern with Father was the lack of bonding between him and the Child and his "lack of getting with the program until here at the last minute."

Foster Mother testified that they had received the Child into their care when he was nine months old. Since then, Foster Mother testified that she and her husband ("Foster Father") had worked diligently to meet the Child's needs. When the Child first entered their care, the Child suffered from gastrointestinal issues and food sensitivities. Due to his difficulty eating, Foster Mother arranged for him to receive "feeding therapy," which lasted nine months to a year. The Child also received speech therapy due to an initial delay in speaking, occupational therapy due to his sensory issues, and behavioral or "play" therapy due to his "heightened amount of anxiety" and "abnormal" behaviors. The therapy he receives is supported by exercises and activities that Foster Mother works with him on at home. Foster Mother testified that the Child requires her undivided attention for six to eight hours a day, that she has to "coach and encourage" him through each meal, and that he needs her help using the bathroom.

Foster Mother further explained that the Child had been negatively affected by visits with both parents but primarily after visits with Father. According to Foster Mother, the Child would be more sensitive, have "melt-downs," cry, and want to be held more after

---

[2] Cynthia testified that Father signed Malakai's birth certificate even though he is not the biological father. She explained that Father signed the birth certificate because the biological father "wasn't a very good man."

- 8 -

visits. In addition, he would have "more extreme responses to things that he doesn't like, like loud noises," disengage from his surroundings, trip and fall more easily, and have difficulty going to sleep. According to Foster Mother, the Child's behavior improved during the sixty days in which Father's visitation was suspended. Ms. Kesterson also testified via deposition that the Child had made great progress during the sixty-day hiatus from Father.

The Juvenile Court entered a final order terminating Mother's and Father's parental rights to the Child on January 25, 2023. The Juvenile Court found that DCS had established by clear and convincing evidence all three of the statutory grounds alleged and that it was in the Child's best interest that Mother's and Father's parental rights be terminated. Both Mother and Father timely appealed.

## Discussion

Although not stated exactly as such, Father and Mother each raise the following issues on appeal: (1) whether the Juvenile Court erred in finding clear and convincing evidence for the ground of abandonment by failure to establish a suitable home; (2) whether the Juvenile Court erred in finding clear and convincing evidence for the ground of persistent conditions; (3) whether the Juvenile Court erred in finding clear and convincing evidence for the ground of failure to manifest an ability and willingness to assume custody; and (4) whether the Juvenile Court erred in finding that termination of parental rights was in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors .

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

. . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

- 11 -

court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g.*, *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

On July 20, 2021, when DCS filed its petition seeking to terminate Father's and Mother's parental rights, the grounds at issue read as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

\*\*\*

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

\*\*\*

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g) (West July 1, 2021 to June 30, 2022).

The abandonment ground at issue, failure to provide a suitable home, is set out as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

\*\*\*

- 13 -

(ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (West July 1, 2021 to June 30, 2022).

We will address first whether the Juvenile Court erred by finding clear and convincing evidence for the statutory ground of abandonment by failure to provide a suitable home. We note that it is undisputed that DCS filed a petition alleging and then proving that the Child was dependent and neglected and that the Child was removed from Mother's physical and legal custody and Father's legal custody pursuant to a court order. Subsection (a) of this statutory ground is therefore met for both Mother and Father. With respect to subsection (b), the Juvenile Court found in its dependency and neglect order that DCS had made reasonable efforts to prevent the Child's removal from parents' custody and that given the family's circumstances it would have been reasonable to make no efforts to prevent removal. This requirement is accordingly met for both parents as well.

However, in reviewing the Juvenile Court's findings related to subsection (c), we conclude that the Juvenile Court failed to provide sufficient findings of fact relevant to Mother's "reciprocal reasonable efforts" or "lack of concern" for the Child. Although the Juvenile Court made sufficient findings related to DCS's efforts, it made no such findings related to Mother's efforts or lack thereof but rather based its decision on Mother's circumstances. This Court has previously concluded: "A parent is only required to make

- 14 -

'reasonable efforts' to establish a suitable home; 'successful results' are not required." *In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *8 (Tenn. Ct. App. July 6, 2021) (quoting *In re D.P.M.*, No. M2005-02183-COA-R3-PT, 2006 WL 2589938, at *10 (Tenn. Ct. App. Sept. 8, 2006)). Here, instead of focusing on Mother's efforts or whether she had demonstrated a lack of concern for the Child, the Juvenile Court focused on whether Mother's efforts were successful. After determining that DCS had made reasonable efforts, the Juvenile Court made the following findings about Mother's current circumstances: (1) Mother has had another child since the Child's birth and given this child up for adoption, (2) Mother does not have a suitable home for the Child, (3) many hours are required each day to care for the Child, (4) transportation is required for the Child to attend various therapy appointments, and (5) Mother does not have the ability to meet the Child's needs and cannot remedy her issues in the foreseeable future. Although these findings clearly demonstrate Mother does not presently have a suitable home or ability to properly care for the Child, the Juvenile Court did not provide any findings related to Mother's efforts as required as to this ground. *See In re Navada N.*, 498 S.W.3d 579, 594 (Tenn. Ct. App. 2016) ("Our review is therefore hampered by the omission of specific factual findings in the trial court's written order. . . . It is not the role of this Court to parse the record in search of clear and convincing evidence . . . to make factual findings where the trial court fails to do so."). We therefore vacate the Juvenile Court's finding of this statutory ground as to Mother.

Turning to the Juvenile Court's findings related to Father, we note that the Court did not limit its findings regarding DCS's reasonable efforts to a four-month period. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c) ("For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child . . . ."). The Juvenile Court instead appears to have considered DCS's efforts during the entire custodial period. This Court has previously affirmed trial courts that consider DCS's efforts during any four-month period. *See In re Jakob O.,* No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) ("According to an ordinary reading of the statute, however, the proof necessary to support termination under this ground need not be limited to any particular four-month period after removal."); *State, Dep't of Children's Servs. v. V.E.F.*, No. M2008-01514-COA-R3-PT, 2009 WL 605146, at *5 (Tenn. Ct. App. Mar. 9, 2009) ("The evidence in the record convincingly establishes that for a period of far in excess of the statutory four months following the children's removal from Mother's custody . . . .").

Although DCS did not make as many efforts to assist Father as it did to assist Mother, Mother faced more obstacles to reunification than Father did. Father only faced two primary obstacles to reunification: (1) his shared residence with Cynthia and (2) the absence of a meaningful relationship with the Child due to his inconsistent visitation with the Child. DCS's efforts to assist Father establish a suitable home therefore were related to these two issues. According to Ms. Vineyard, DCS offered both parents free parenting

classes and offered Father visitation with the Child at the beginning of the case. DCS provided therapeutic visitation, conducted home visits, and developed a permanency plan that included goals and responsibilities for Father. Ms. Gardner also described efforts to help Father learn to appropriately interact with the Child.

Despite DCS's efforts to foster a bond between Father and the Child, Father did not visit the Child consistently. When the Child was first removed to DCS custody in July 2020, Father would not visit the Child until DNA testing had been completed. Ms. Vineyard testified that when Father did begin visitation, he would "constantly" cancel visits and did not visit the Child at all from October 19, 2020, until January 22, 2021. Father declined DCS's offers to provide him visits via video conference. Ms. Vineyard, who was assigned to the case from July 2020 until August 2021, stated that the only time Father ever took advantage of the full four hours of visitation offered to him was in February and March of 2021. Father testified that he spent two hours per month with the Child for much of the prior year and acknowledged that he did not begin visiting the Child consistently until two months prior to trial.[6] Based upon the testimony at trial, Father spent on average two hours per month with the Child.

Not only did Father visit inconsistently, Father often did not act appropriately at visits. Ms. Vineyard testified that she explained to Father that the Child had strict dietary restrictions that needed to be followed, but Father initially did not take these instructions seriously and would get angry with Ms. Vineyard when she tried to instruct him on the situation. She further testified that Father cursed at her in front of the Child. Ms. Vineyard eventually had to be removed from the case after the Juvenile Court entered a restraining order due to a threatening statement Father made about her to a therapeutic visitation supervisor.

In addition, the Juvenile Court suspended Father's visitation for sixty days after DCS filed a petition alleging that the Child's retained Moro reflex issues were aggravated after visits with Father. Ms. Vineyard testified that Father was overly affectionate toward the Child, that he would "constantly try and hold him, and hug him, and kiss him on the face, and touch him." According to Ms. Vineyard, the Child did not like this type of contact and was uncomfortable around Father, leading her to transition Father's visitation to therapeutic visitation, hoping that a therapist could help Father act appropriately with the Child. As late as August 2022, a few months prior to trial, Father still did not take the Child's retained Moro reflex issue seriously. Ms. Gardner testified that she supervised a visit in August in which "the occupational therapist came in to be able to observe [Father], to be able to teach him about appropriate interaction for children with Moro Reflexes, fight or flight kind of issues, that [the Child] seem[ed] to have in the foster home following

---

[6] At the May 2022 hearing, Father testified that he did not visit the Child in October or November of 2021, visited the Child once in December 2021, once in January 2022, once in February 2022, twice in March 2022, and once in April 2022.

visits." Once the occupational therapist left the visit, Father disregarded the instructions and "snatched up" the Child. At the end of the visit, Father did not take with him any of the notes or instructional paperwork provided by the occupational therapist.

Based upon our review of the record, we conclude that DCS made reasonable efforts to help Father develop a bond with the Child and that Father failed to make reciprocal reasonable efforts. Furthermore, Father demonstrated a lack of concern for the Child to such a degree that it appears unlikely that he will be able to provide a suitable home for him at an early date. Father had only two goals that would have made him eligible to achieve custody of the Child: (1) remove Cynthia from his home and (2) develop a meaningful relationship with the Child through consistent and appropriate visitation. Despite only these two requests, Father completed neither.

On appeal, Father argues that his shared residence with Cynthia did not render his home unsuitable because they retained custody of two children from their relationship without concern from DCS, as well as Ms. Gardner's testimony that she did not have an immediate concern about Cynthia's past drug use. According to Father, Ms. Gardner testified that "she had only one issue with [Father] and that her only concern was with him bonding with the child." Even if we were to grant Father that Cynthia is no longer a concern to the Child's well-being, this does not change the fact that the evidence demonstrated that Father had not developed a bond with the Child or consistently visited the Child. Considering the significant therapy and attentiveness that the Child requires, it is doubtful that Father could adequately tend to all of the Child's needs given that he failed to consistently visit the Child twice a month. *See State, Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007) ("a suitable home requires more than a proper physical living location"). We accordingly affirm the Juvenile Court's finding of this statutory ground.

We now address the Juvenile Court's finding of the statutory ground of persistent conditions. It is undisputed that the Child had been removed from Mother's physical and legal custody and Father's legal custody for more than six months. By the time of trial, the Child had been in DCS custody for more than two years. As previously stated, DCS filed a petition alleging that the Child was dependent and neglected. On July 24, 2020, the Juvenile Court entered an emergency protective custody order finding that there was probable cause that the Child was dependent and neglected "*due to the substance abuse issues of the mother, lack of housing, and because the legal father's fiancé has been substantiated in the past for Drug Exposed Child.*"

With respect to Mother, the Juvenile Court found:

This ground is proven by clear and convincing evidence. It is clear from the record that the factors which led to removal of the child, continue to exist as to mother.

- 17 -

The record clearly indicates the mother was living in a homeless shelter as recent as September 2022. The mother has been unable to hold a consistent job and certainly cannot demonstrate today that she can provide a safe and stable home for this child. While the Court recognizes a parent's right to parent their children this child cannot be safely returned to this mother by any stretch of the imagination today or at any time in the future. The conditions that require the child's placement still exist some two years after removal. The Court finds this ground proven as to the mother.

Based upon our review of the record, we agree with the Juvenile Court that the conditions that necessitated the removal of the Child from Mother's custody persisted. Although the evidence demonstrated that Mother passed her drug screens, Mother had not resolved her homelessness. Mother testified that she was living at KARM at the time of trial. Furthermore, Mother was unable to maintain employment during the custodial period. Ms. Vineyard approximated that the longest period of employment Mother maintained while she was managing the case was thirty to sixty days. Mother testified, however, that her longest stint of employment was a period of six months.

Both Mother and Ms. Gardner attributed Mother's inability to maintain employment to her anxiety. Ms. Gardner testified that Mother lost jobs at a shoe store and a fast food restaurant due to her anxiety. Ms. Gardner further explained:

And without housing, without income, there's -- and we're dealing with like two years now -- over two years now that we've been doing this. And she's never had reliable housing or income. I just don't see how we could ever place [the Child] in her care with her mental health issues that keep interfering with her employment issues.

Ms. Gardner also testified that Mother did not have a vehicle or a driver's license.

Although Mother demonstrated improvement by visiting the Child consistently and testing negative for illegal drug use, other conditions that led to the Child's removal, such as her homelessness, persisted. At trial, Mother attributed her inability to find stable housing due to the fact that she was burdened by a debt of "back rent" that she had been ordered to pay pursuant to her "divorce decree" from Father. Despite her efforts to find and maintain stable housing and employment, it is undeniable that she was unable to secure either after two years. In contrast to the abandonment ground previously addressed, we note that this statutory ground focuses on the results of the parent's efforts rather than on the efforts themselves. *See In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005) ("[T]his new ground for termination focused on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them."); *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *20 (Tenn. Ct. App. Sept. 14, 2012)

("the ground of persistent conditions focuses on whether the parent's efforts have been fruitful"). We therefore conclude that certain conditions that led to the Child's removal persisted such that the Child could not be safely returned to Mother.

We further determine that there was little likelihood that Mother could have remedied her housing situation at an early date, particularly given that she was unable to do so after more than two years. Mother's sole argument on appeal is that she is now eligible for public housing now that her debt has been paid. However, the fact remains that she has no stable housing and has been unable to secure steady employment, without which her ability to retain housing and provide for the Child is unlikely. Moreover, it is evident that continuation of the parent and child relationship greatly diminishes the Child's chances of early integration into a safe, stable, and permanent home, again given that the Child had already lingered in foster care for over two years, had found a stable home with his foster family, and had many therapeutic needs. We therefore find as the Juvenile Court found that the ground of persistent conditions was proven against Mother by clear and convincing evidence.

With respect to Father, the Juvenile Court made the following findings:

The Court finds this ground proven by clear and convincing evidence.

This child has been in DCS custody at the time of trial for some twenty-seven months. The father had numerous opportunities to have the child returned early in the case but his actions were not to provide a safe home but rather he created an environment of chaos and neglect. He chose to reside with [Cynthia], who was not his wife at the time and ignore the issues that her involvement has created. He was abusive and aggressive in his attitude with the Department and he was not at all interested in addressing the conditions and disabilities the child suffers from. He has not shown or has failed to demonstrate that he understands the ability to safely care for the child and this Court does not believe the father's issues will be resolved in the near future.

The involvement with the father's (paramour) now wife, who lost custody of her two children on two separate occasions clearly pose a problem for father's reconciliation. There are concerns about father's mental health and his behavior toward DCS workers and others.

The lack of bonding with the child and the prior drug abuse by [Cynthia] prevent reconciliation with this child.

The record supports the Juvenile Court's findings related to this statutory ground.

In its petition for temporary legal custody of the Child, DCS alleged that Father's "paramour [Cynthia] [was] a substantiated perpetrator in the DCS system for Drug Exposed Child," that Father was "not willing to make her leave," and that he had only seen the Child once since the Child's birth. The Juvenile Court's dependency and neglect order reflected Father's stipulation that the Child was dependent and neglected "because at the time of removal, his paramour was restricted from her own children[.]" Based upon our review of the record, we conclude that his relationship with Cynthia and his lack of a meaningful relationship with the Child were either conditions that led to the Child's removal from his legal custody or other conditions that would have put the Child at risk of further abuse or neglect and that these two conditions persisted at the time of trial. We have already discussed and affirmed the Juvenile Court's findings that Father did not visit the Child consistently to create a parental bond.

Father argues that because Cynthia and he maintained custody of two children from their relationship, his home is suitable for the Child despite Cynthia's history of substance abuse and abuse of her own children. In another portion of its order, the Juvenile Court acknowledged Cynthia's testimony that she was now sober, but ultimately found that her presence posed a "major risk" to the Child and that Father did not "seem to appreciate this risk." The Juvenile Court also noted that Father and Cynthia had violated court orders regarding visitation with Micayah and Malakai because Father would visit Cynthia's children with her in contravention of a court order providing that only Cynthia attend visits. The Juvenile Court's concern is reasonable considering Father's plan to rely on Cynthia for childcare and his testimony that he was unaware that Cynthia was using illegal drugs while he was in a relationship with her.

Father testified that he could not say definitively whether Cynthia was using illegal drugs while she was pregnant with their son, Clifton, who was born three months after the Child. Father's apparent lack of knowledge or confidence in Cynthia's sobriety is best demonstrated by this interaction between the State's attorney and Father:

[State's Attorney:] When you have -- It sounds like at one point, you and your wife were kind of on again/off again. And were there times where you thought she wasn't using drugs and she was?

[Father:] That, that is a possibility, yes. And, I mean, that was, that was a big thing with it, I mean, because of what happened with the kids, you know. So, I always keep a close watch with it. You know, that's nothing that's never in the back of my mind.

However, even if we were to agree with Father's argument that his relationship with Cynthia should not be considered an adverse condition that persisted given her recent

sobriety, this does not alter the fact that Father did not take visitation with the Child seriously, given his inconsistency and inappropriate behavior during visits. On appeal, Father blames DCS for the absence of a meaningful relationship between himself and the Child, arguing that "DCS did everything in its power to keep the Child from bonding with his Father", "DCS failed to place the Child with the Father initially", "DCS chose to pursue DNA testing against the mother's paramour first", and "DCS twice suspended the Father's visitation . . . due to an issue with the DCS caseworker . . . and . . . the child's mor[o] reflex issues." The evidence in the record contradicts these assertions. Father acknowledged during his trial testimony that he was responsible for delaying visitation with the Child until DNA testing had been completed. Furthermore, DCS did not place the Child with Father because he continued to live with Cynthia despite her serious and recent history of exposing her children to illegal substances. Finally, DCS sought suspension of Father's visitation for valid reasons as we already have addressed. DCS is not responsible for Father's actions or failure to develop a healthy and meaningful relationship with the Child.

Given the fact that Father had more than two years to develop a relationship with the Child, yet failed to do so, we cannot conclude that Father could remedy this issue at an early date. We further find that the Child could not be placed safely with Father. At the time of trial, the Child attended several different appointments for various types of therapy. In the two years since the Child had been removed from his legal custody, Father failed to demonstrate that he could consistently attend visits twice per month, let alone arrange for the Child to attend all of his therapeutic appointments or provide him with the undivided attention that he requires. As with Mother, continuation of the parent-child relationship between Father and the Child greatly diminishes the Child's chances of early integration into a safe, stable, and permanent home, considering how long the Child has already lingered in foster care, the stable foster home he currently resides in, and Father's inconsistent involvement with this case. We accordingly affirm the Juvenile Court's finding of this statutory ground for termination.

We next address whether the Juvenile Court erred by finding the ground of failure to manifest an ability and willingness to assume custody. Regarding the first prong of our analysis, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citation omitted). The second prong of the statute requires the court to consider whether placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *See* Tenn. Code Ann. § 36-1-113(g)(14).

In regard to Mother, the Juvenile Court made the following findings of fact:

The court finds this ground has been proven by clear and convincing evidence. It is important to note that Mother appeared at this trial on day two

- 21 -

and left before trial started after an unprovoked angry outburst in Court. She did not return. The Court finds this is consistent with her erratic behavior throughout this case as proven by the record.

When [the] child was taken into custody, Mother was homeless and using drugs. Throughout this case, the record reflects, mother has failed to maintain employment for any length of time and does not have housing at the time of trial. She continues to live in Knox Area Rescue Ministry and was there as recent as September 2022. Mother has no car or driver's license and has no transportation plan. The failure to have housing and a vehicle has caused missed visits with the child. The lack of housing and employment has continued to be a problem for the last two years. In addition, the Court finds the mother appears to have mental health issues which are untreated and would prevent her from caring for a child with serious health and developmental issues.

The Court finds that the mother has failed to manifest by act or omission an ability and willingness to personally assume legal or physical custody or financial responsibility of the child. Placing this child with her would pose a risk of substantial harm to the physical and psychological welfare of the child. TCA 36-1-113 et seq. It is clear to this court that mother does not have the ability to parent this child especially given the special needs of the child described in the record, which include multiple therapy appointments every week and daily behavior intervention techniques. While mother has visited consistently, much more is required to demonstrate an ability to parent and this is not possible based on this mother's actions, as clearly noted in In re: Nevaeh M. 2019.00313-SC-R11, at 22 (Tenn Ct. App. Dec. 10, 2020). The mother must show the willingness and ability to assume custody. While mother contests this termination, her actions in most respects rise only to the level of an objection and not a true showing of her ability and willingness to parent.

The evidence does not preponderate against these findings.

Throughout the Child's time in DCS custody, Mother struggled to maintain employment and housing. On appeal, Mother argues that by the time of the trial, she had "overcome her housing difficulties that were created through no fault of her own, had transportation, and had employment." The record does not support her argument. At the time of trial, Mother was living at KARM. Although she testified that she had obtained a voucher for public housing, she had not yet secured housing. She testified that she was relying on her mother for income and transportation. As for employment, Mother testified that she had been working at a Family Dollar for a week prior to trial. She reported that she lost employment at other businesses due to her anxiety. Based upon the testimony at

trial, it was evident that Mother was unable to assume custody of the Child. Without a stable home or form of employment, we agree with the Juvenile Court that placing the Child with her would pose a risk of substantial harm to the physical and psychological welfare of the Child, particularly considering the Child's therapeutic needs. We accordingly affirm the Juvenile Court's finding by clear and convincing evidence of this ground as to Mother.

Concerning Father, the Juvenile Court found the following:

This Court finds this ground proven by clear and convincing evidence as to the father.

This Court believes father has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child and that placing the child in father's legal and physical custody would pose a risk of substantial harm to the physical and psychological welfare of the child.

This father clearly has attempted to make recent improvements but it is important to note the huge difficulties posed by father's actions early in this case which have continued much to the detriment of the child.

Following removal and throughout much of this case, the father has been abusive and difficult to deal with. The father was very erratic in his visitation at the time of the petition being filed. He has only visited for two months where he saw the child on both visits. He has various excuses for those missed visits but the Court believes they are lacking. The Court finds that father has only really attempted to understand and forge a bond with the child during visits. No other attempts have been made to participate or bond with the child. His lack of understanding of the child's conditions and failure to follow direction as to proper feeding and parental bonding techniques have caused major problems both with the child and his providers. Initially the father did not believe he was the child's father and refused to participate in child's care even though he was the child's legal father. He did not visit until January 2021 by his own admission.

Father's actions required that he have therapeutic visits only with child. Father's attitude and refusal to appreciate the child's issues and needs prevented any real progress. Father's abusive attitude was directed to a DCS worker at one point to the concern of the Court. The Court was required to order the father to have no contact with the worker due to his actions. At the time this case was heard, the father still only receives therapeutic visitation.

The Court is also very concerned about the father's wife. She has history with DCS and has had two children removed from her custody for "severe abuse." [Cynthia] was found to have abused her own children on two separate occasions. While [Cynthia] says she is now sober, the Court believes this situation poses a major risk to this child and the father does not seem to appreciate this risk.

The father began the relationship with [Cynthia] while still married to the mother. Clearly, he and [Cynthia] were violating court orders from Knox County regarding visitation during the pendency of this case. The Court notes that [Cynthia's] testimony indicates she now has two other children born following removal of her two other children. Clearly, the home situation created by the father is not appropriate for this child.

The Court finds that placement with the father is not appropriate especially when viewed in light of the fact the child requires numerous hours of therapy and care both physically and developmentally. Substantial testimony has been offered concerning the child's difficulty in bonding with the father and there is proof of various negative behaviors and problems exhibited by child when he has been in contact with his father. The chaotic situation surrounding the home and the needs of this child clearly reflect that placement with his father is not possible. The Court finds this ground proven by clear and convincing evidence.

Although the evidence does not preponderate against most of these findings, we recognize that the Juvenile Court incorrectly found that Father had not visited the Child until January 2021. Testimony from Father and Ms. Vineyard demonstrated that Father did not visit the Child until September 2020, even though the Child was removed from his custody in July 2020, and that he did not visit the Child at all from the end of October 2020 to the end of January 2021. Ms. Vineyard testified that the Child had to be reintroduced to Father in January 2021. Father further acknowledged at trial that he did not begin visiting the Child consistently until two months before trial. Therefore, given Father's otherwise sporadic visitation, this error is harmless.

Father's lackluster approach to visitation demonstrates that he was neither able nor willing to assume custody of the Child. In addition to his inconsistency, Father did not act appropriately during visits with the Child. He cursed at Ms. Vineyard during visits, was slow to comply with the Child's dietary restrictions, and was insensitive to the Child's retained Moro reflex issues. Father's behavior ultimately led to a restraining order against him in favor of Ms. Vineyard, a change in case workers, and a sixty-day suspension of visitation in May 2022. In addition and as previously noted, the Child required six to eight hours of close attention per day and attended appointments for occupational therapy and play therapy. Father more often than not visited the Child only once per month and often

- 24 -

canceled visits, demonstrating a lack of seriousness. We therefore cannot conclude that Father was willing or able to provide the Child with the attentiveness he needed.

Returning the Child to Father's custody would also place the Child at risk of substantial harm given the lack of a meaningful relationship between the Child and Father, Father's behavior during visits, and his shared residence with Cynthia. Although we recognize Cynthia's testimony that she no longer uses illegal substances and Ms. Gardner's testimony that Cynthia has passed two random drug screens, we find the Juvenile Court's caution reasonable given that Cynthia would be the person caring for the Child while Father worked, that Father was previously ignorant of Cynthia's substance abuse, and that the Child had never met Cynthia.

Furthermore, removing the Child from his foster family and placing him with Father would pose a risk of substantial harm to the Child. Foster Mother testified that the Child had been with her family for over two years from the time he entered DCS custody at nine months old. Her testimony clearly demonstrated that she had cared diligently for the Child, taking him to weekly therapeutic appointments and coaching him through meals and other daily activities. Father candidly testified that foster parents had been "absolutely amazing." Foster Mother also testified to the bond between the Child and Foster Father, who she described as the Child's "favorite person on Earth." Therefore, removing the Child from this loving and attentive home and placing him with Father, who could not muster the effort to consistently attend two visits per month, would certainly pose a risk of substantial harm to the Child's well-being. *See In re Elijah H.*, No. M2020-01548-COA-R3-PT, 2021 WL 4593844, at *12 (Tenn. Ct. App. Oct. 6, 2021) ("This Court has previously determined that removing a child who has 'bonded and thrived' with his current family and placing a child in the custody of a near-stranger would amount to substantial harm."). We affirm the Juvenile Court's finding of this ground as it relates to Father.

Having concluded that DCS established at least one statutory ground for termination of Mother's and Father's parental rights, we now consider the Juvenile Court's determination that termination of their parental rights was in the Child's best interest. On July 20, 2021, when DCS filed its termination petition, the statutory best interest factors read as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2021 to June 30, 2022).

With regard to making a best interest determination, the Tennessee Supreme Court has instructed:

> These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).[7]

The Juvenile Court weighed all of the best interest factors in favor of termination of Mother's and Father's parental rights with the exception of factors (F) and (S), which it found inapplicable. With the exception of certain factors weighed against Mother, we affirm the Juvenile Court's overall weight placed in favor of termination of both Mother's and Father's parental rights.

Concerning factors (A) and (B), Mother and Father appear to object to the Juvenile Court's focus on the foster family rather than the stability and continuity they would provide the Child. We do not find that the Juvenile Court erred in weighing factors (A) and (B) in favor of termination. As the Court noted, the Child had been with the "wonderful foster home" for the entirety of his time in DCS custody, his foster parents had dutifully addressed the Child's many needs and arranged for his many therapeutic appointments, and "the numerous hours required for this child's care can only be best addressed by continuation of the foster placement." Both Mother and Father contend that they could

---

[7] In *In re Gabriella D.*, a prior version of the best interest factors was in effect. However, we believe the Tennessee Supreme Court's analysis applies to the amended version of Tenn. Code Ann. § 36-1-113(i), as well.

provide stability for the Child without indicating evidence that demonstrates that ability. Mother did not achieve stable housing or employment during the two-year custodial period, and Father did not visit the Child consistently. Neither parent demonstrated an ability to care for the Child or accommodate his needs.

Likewise, concerning factor (C), the Juvenile Court found that Mother had no ability to address the Child's day-to-day needs and that Father had failed to progress beyond therapeutic visitation after two years due to his failure to follow instructions and his conflicts with Ms. Vineyard during the Child's visits. The Court specifically noted that Father had "very little, if anything, to do with the minor child for the first ten months" of his life. The evidence does not preponderate against the Juvenile Court's findings.

With respect to factors (D), parental attachment, and (E), regular visitation, the Juvenile Court weighed these in favor of termination of both Mother's and Father's parental rights. The testimony at trial demonstrated that Father had not visited regularly throughout the Child's time in DCS custody and that the Child had not developed a secure, healthy attachment to Father. However, Ms. Vineyard and Ms. Gardner testified that Mother visited the Child consistently and had developed a bond with the Child. The evidence therefore preponderates against the Juvenile Court's findings as they relate to Mother on this factor.

As to factor (G), there was no evidence related to whether Mother or her environment would exacerbate the Child's trauma, and the Juvenile Court made no findings for this factor as it relates to Mother. This factor, accordingly, should not have weighed in favor of termination of Mother's parental rights. In weighing this factor against Father, the Court noted that the Child experienced "inappropriate reactions and problems" after visiting with Father and that Father had not developed a sufficient bond with the Child. The evidence preponderates in favor of these findings as to Father.

The Juvenile Court weighed factors (H) and (I) in favor of termination of their parental rights. The Court noted that the foster family recognized and properly cared for the Child's substantial needs and had gone to great lengths to address those needs. The Court further found that the Child had bonded with his foster parents and foster siblings. The evidence does not preponderate against these findings.

Factors (J), (N), (O), (P), (Q), and (R) all touch on the parent's living conditions, whether the parent has created a safe and stable environment for the Child, and whether the parent can properly take care of the Child. The Juvenile Court weighed all of these factors in favor of termination of both parents' rights. As we have previously noted, Mother has made strides in addressing her substance abuse issues. However, the fact remains that she was living at KARM at the time and could not maintain consistent employment. Although she spoke promisingly about her new eligibility for public housing and new employment at Family Dollar, we cannot conclude that after two years of waiting

the Child should have to wait longer to see if these opportunities will provide long-term stability for Mother.

As for Father, he continued to live with Cynthia throughout the custodial period even though she constituted a person who had shown abuse and neglect to two other children. Although Cynthia testified that she had not used illegal drugs in some time, she continued to have two open cases with DCS related to her drug exposure, abuse, and environmental neglect of two of her children. Moreover, as the Court noted, Father has never progressed past therapeutic visitation after two years, and he did not confront the obstacles to reunification with the seriousness they deserved. He did not demonstrate his ability to care for a child with numerous needs.

Factors (K) and (L) related to the parent's use of available programs and services and DCS's efforts to assist the parent making lasting changes. The Juvenile Court weighed both of these factors in favor of termination of both the parents' rights. With respect to (L), the evidence demonstrated that DCS did make reasonable efforts to assist both parents by setting up mental health, parenting, and alcohol and drug assessments; arranging therapeutic visitation; developing permanency plans; and offering free parenting classes. Specifically, as to Mother, DCS provided drug screens and even transportation to visits for a period of time. Ms. Gardner wrote letters to aid in Mother's search for housing. Father did not consistently take advantage of the therapeutic visitation offered him. Mother, on the other hand, did take advantage of services offered to her. Mother, however, was unsuccessful in making a lasting adjustment even though the evidence demonstrated that she did make attempts.

With respect to factor (M), the evidence clearly demonstrated that Father did not act with urgency in developing a relationship with the Child. This factor undoubtedly weighs in favor of termination of his parental rights. With respect to Mother, again, we find that Mother made attempts, but ultimately could not sufficiently address the conditions that make an award of custody unsafe for the Child.

We also conclude that the evidence does not preponderate against the Juvenile Court's weighing of factor (T) in favor of termination. Mother was unable to maintain employment due to her anxiety. This was a major reason why she was unable to provide a stable home for the Child. Moreover, Mother stormed out of the courtroom on the second day of trial after an outburst. Mother does not have the mental or emotional stability to safely care for the Child. Father also lacks the mental and emotional stability to care for the Child as demonstrated by his angry outbursts at Ms. Vineyard throughout her tenure as the managing care worker.

Despite that the Juvenile Court erroneously weighed some factors in favor of terminating Mother's parental rights, these errors were harmless considering the Court's weighing of other significant factors such as her inability to care for the Child, the Child's

numerous therapeutic needs, the "daily behavior intervention techniques" required to address the Child's needs, and the foster family's ability to carry out the responsibilities of addressing his needs. Despite Father only facing two major obstacles to regain custody of the Child, Father did not approach these obstacles with seriousness and failed to develop a meaningful relationship with the Child. We affirm the Juvenile Court's finding that termination of Mother's and Father's parental rights to the Child was in the Child's best interest.

## Conclusion

The judgment of the Juvenile Court is affirmed in part and vacated in part. We vacate the Juvenile Court's finding of the ground of abandonment by failure to provide a suitable home as it relates to Mother. We affirm the remainder of the Juvenile Court's judgment, including the termination of Mother's and Father's parental rights. This cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellants, Alyse C. and Justin S., and their sureties, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE